IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, NORTHERN DIVISION

| UNITED STATES OF AMERICA, Plaintiff, v. TOOTOO SAVAIINAEA, JR., Defendant. | MEMORANDUM DECISION AND ORDER DENYING MOTION TO SUPPRESS  Case No. 1:12-cr-00038  Judge Clark Waddoups |
|---|---|

Defendant has moved the court to suppress evidence found in the trunk of the vehicle he was driving when he was arrested on April 17, 2012. [Dkt. Nos. 18, 22, 26]. After reviewing the supporting and opposing memoranda, hearing evidence and oral argument, and reviewing the requested supplemental briefs, the court now denies Defendant's Motion to Suppress.

## **BACKGROUND**

On April 17, 2012, Defendant was arrested after a traffic stop and a search of the interior of the vehicle he was driving revealed two baggies containing methamphetamine—16.16 grams in one bag and 29.37 grams (i.e. slightly over one ounce at approximately 28 grams to an ounce) in the other—floating visibly in a Styrofoam cup on the center console. (Tr. Ev. Hrg. 15 Nov. 6, 2012 [Dkt. No. 23].) Searching the rest of the car, agents found a locked safe in the trunk and a guitar case. While Defendant was being taken into custody, agents were able to open the safe and found an additional 58.2 grams of methamphetamine, cash in the amount of $1,772, other drug paraphernalia, and high capacity magazines. The soft, zipper-closed guitar case contained a semiautomatic .410 shotgun that was dressed up to resemble an AR-15 style assault rifle. Three

pistols were also found in the search of the trunk, including one that had been reported as stolen. (*Id.* at 16, 25.)

This traffic stop was neither random nor the beginning of law enforcement's focus on Defendant. In March 2012, a confidential informant (the "CI") had given Agent Jason Vanderwarf of the Roy City Police Department's Weber Morgan Narcotics Strike Force information about Defendant's drug dealing activities. The CI informed Agent Vanderwarf that Defendant, whom the CI identified as a large Polynesian man with long hair and known as "T", usually dealt in about three to four ounces of methamphetamine at a time and kept a safe with him in the vehicle in which he was travelling, typically in the trunk, and a guitar case containing a rifle, which he typically kept in the front seat, at all times. The CI had provided reliable information to Agent Vanderwarf, which Agent Vanderwarf had been able to corroborate, on three separate prior occasions since approximately September 2011, and Agent Vanderwarf had no reason to doubt the CI's credibility. (*Id.* at 6-8.)

On March 29, 2012, Agent Vanderwarf used the CI to arrange and conduct a controlled buy of a small amount of methamphetamine from Defendant. The CI arranged to buy the drugs from Defendant at the shop where Defendant worked. Agent Vanderwarf observed the controlled buy from approximately 120 to 150 feet away using binoculars. In doing so, Agent Vanderwarf saw Defendant emerge from the shop where he worked, approach the CI's vehicle, engage in small talk, and then give the CI a package of cigarettes that contained the small amount of methamphetamine. Despite witnessing this controlled buy, Agent Vanderwarf did not arrest Defendant at that time because he was trying to confirm his identity given that the CI only knew him as "T". Agent Vanderwarf was able to confirm Defendant's name after Defendant was stopped for a traffic violation by North Ogden police sometime between March 29 and April 17,

2012. Defendant was known to the North Ogden police as a suspected drug dealer and during the traffic stop they observed a guitar case sitting in the passenger side of the vehicle Defendant was driving. However, they let Defendant leave after he denied them consent to search his vehicle at that time. After this traffic stop, the North Ogden police learned of Agent Vanderwarf's investigation and provided him with information about Defendant's identity, and based on this identification using "a driver's license or identification-style picture", the CI then confirmed that his contact "T" and Defendant were the same person. Agent Vanderwarf had also seen Defendant during the March 29 controlled buy and could identify him from this identification. (*Id.* at 9-10, 17-20.)

After confirming Defendant's identity, Agent Vanderwarf worked with the CI to set up another controlled buy, this time for one ounce of methamphetamine at a price of $1,350. The CI placed a telephone call to Defendant to make the arrangements. According to this plan, the CI would meet Defendant at a pre-arranged location to buy the drugs ("2100 South, just off the highway at the Flying J"). Agent Vanderwarf listened to the actual phone call as it took place. Agent Vanderwarf then arranged for agents to be in the area and for the assistance of the Utah Highway Patrol. In a preparatory briefing with the participating agents and troopers, safety was emphasized because Defendant was known to carry a rifle in a guitar case. Not knowing which route Defendant would take to get to the meeting place, Agent Vanderwarf instructed the Utah Highway Patrol during the briefing to make a traffic stop in a safe area. Agent Vanderwarf then observed Defendant leaving the shop where he worked and followed him according to the plan (*Id.* at 10-13.)

The Utah Highway Patrol was able to make a traffic stop based on Defendant's left turn from a right turn only lane to stop him in a safe area so that Agent Vanderwarf and others could

proceed with their action. Agent Vanderwarf was following the Utah Highway Patrol trooper who pulled Defendant over. That trooper observed Defendant make a furtive move toward the console of the car and on that basis had him removed from the car because of the information that law enforcement had received about Defendant's custom of carrying a rifle in a guitar case with him in the passenger seat of the car. Agent Vanderwarf then handcuffed Defendant, placed him under arrest, read him his *Miranda* rights, and placed him in the Utah Highway Patrol trooper's vehicle. Defendant indicated that he was not giving his consent to search the vehicle. (*Id.* at 10-12, 23, 28.) But "based off of probable cause—for the arrangement that the defendant was going to be carrying and distributing illegal narcotics" (*id.* at 14), while Agent Vanderwarf was taking Defendant into custody, other agents searched the vehicle, first finding the two plastic bags with drugs visibly floating in the Styrofoam cup on the center console and then the locked safe, guitar case containing the shotgun and other items, and three pistols in the trunk (*id.* at 15-16).

Agent Vanderwarf testified that "the primary reason" for pulling over Defendant and for his arrest and the search of the vehicle, "was based off of the probable cause and the arrangement made by the confidential informant for the purchase of narcotics." (*Id.* at 22.) That is, the reason that Agent Vanderwarf was following Defendant and the reason that he had arranged a briefing with other agents and the Utah Highway Patrol on April 17, 2012, was to put the plan into motion to arrest Defendant with drugs that Defendant was going to sell to the CI as arranged under Agent Vanderwarf's direction. (*Id.* at 28.)

## **DISCUSSION**

The Supreme Court has recently narrowed the broad reading of *New York v. Belton*, 453 U.S. 454 (1981) that controlled for 28 years and from which, according to the Court, a sense of

"police entitlement" to perform vehicle searches pursuant to virtually any arrest had developed, was widely taught in police academies, and was generally relied on by law enforcement in many jurisdictions. *Arizona v. Gant*, 556 U.S. 332, 347, 349 (2009).[1] In *Gant*, the Court found that the broad construction of the *Belton* rule created "a serious and recurring threat to the privacy of countless individuals." *Id.* at 345. Accordingly, the *Gant* Court narrowed *Belton*, holding that

> [p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest. When these justifications are absent, a search of an arrestee's vehicle will be unreasonable unless police obtain a warrant *or show that another exception to the warrant requirement applies*.

*Id.* at 351 (emphasis added). The italicized language in the above quote shows that Defendant's reliance on *Gant*'s needed narrowing of *Belton* in this case is misplaced.

Defendant was arrested after a traffic stop but the warrantless search of the car he was driving was based on independent probable cause. "Under the automobile exception to the warrant requirement, police officers may stop and search a car if they have probable cause to believe it contains contraband, regardless of whether a traffic violation has occurred or a search warrant has been obtained." *United States v. Benard*, 680 F.3d 1206, 1210 (10th Cir. 2012) (citing *United States v. Chavez*, 534 F.3d 1338, 1343-45 (10th Cir. 2008)). In its straightforward application of the "specifically established and well-delineated" automobile exception to the principle that any warrantless search is "per se unreasonable under the Fourth Amendment," *see United States v. Ross*, 456 U.S. 798, 825 (1982), the Tenth Circuit in *Benard* did not even refer to *Gant*, presumably because *Gant* clearly does not implicate the continued independent application of the automobile exception.

---

[1] "Construing *Belton* broadly to allow vehicle searches incident to any arrest would serve no purpose except to provide a police entitlement, and it is anathema to the Fourth Amendment to permit a warrantless search on that basis." *Id.* at 347. "The fact that the law enforcement community may view the State's version of the *Belton* rule as an entitlement does not establish the sort of reliance interest that could outweigh the countervailing interest that all individuals share in having their constitutional rights fully protected." *Id.* at 500.

In fact, the *Gant* court addressed the potential interplay between its narrowing of the *Belton* rule and the continued application of the automobile exception under *Ross*. The narrowing of *Belton* as described above did not change the fact that "[i]f there is probable cause to believe a vehicle contains evidence of criminal activity," the automobile exception explained in *Ross* still "authorizes a search of any area of the vehicle in which the evidence might be found." 556 U.S. at 347. "*Ross* allows searches for evidence relevant to offenses other than the offense of arrest, and the scope of the search authorized is broader." *Id.* In other words, *Gant* does not change the well-established framework for evaluating the application of the automobile exception.

The *Ross* framework governing the automobile exception "allows the police to 'search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." *United States v. Burgess*, 576 F.3d 1078, 1087 (10th Cir. 2009) (quoting *California v. Acevedo*, 500 U.S. 565, 580 (1991)). "Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence." *Benard*, 680 F.3d at 1210. In fact, "[t]he scope of a warrantless search [of an automobile under the automobile exception] based on probable cause is no narrower—and no broader—than the scope of a search authorized by a warrant supported by probable case." *Burgess*, 576 F.3d at 1087. When such independent probable cause exists, therefore, "the search otherwise is as the magistrate could authorize." *Id.* Moreover, when law enforcement is conducting such a search under the automobile exception, "nice distinctions between . . . glove compartments, upholstered seats, trunks, and wrapped packages, in the case of a vehicle, must give way to the interest in the prompt and efficient completion of the task at hand." *Id.* The trunk and the locked safe in the trunk, therefore, are properly targets of the search where independent probable cause justifies a warrantless search under the automobile exception.

6

Here, the court finds that Agent Vanderwarf and his colleagues had sufficient independent probable cause to perform the warrantless search of the vehicle Defendant was driving based on reliable information that Defendant was a drug dealer travelling to a pre-arranged controlled buy with a considerable amount of methamphetamine in his possession, a safe containing the drugs, and a guitar case containing a rifle. And, in fact, all of these were found in the search of the car Defendant was driving, consistent with information about Defendant's methods and as coordinated by Agent Vanderwarf and the CI.

*Gant* is not helpful to Defendant because it applies to a different situation—the case in which there is not sufficient independent probable cause to perform a warrantless vehicle search under the automobile exception. If no independent grounds for the application of the automobile exception exist, then upon a traffic stop of a defendant, *Gant* applies to narrow the *Belton* rule so that a warrantless search of the vehicle is per se unreasonable unless "the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." 556 U.S. at 351. Under *Gant*'s narrowing of *Belton*, such a warrantless search would rarely if ever be justified because a secured arrestee is rarely within reaching distance of the passenger compartment at the time of the search[2] and where the "offense of arrest" is a traffic violation, no probable cause would exist to justify a warrantless search of the vehicle to search for evidence.[3]

In *Gant*, to illustrate, the defendant was arrested for driving with a suspended license after he had already stepped 10 to 12 feet away from the vehicle. *Id.* at 336. Once he was secured, police officers searched his car under the formerly controlling broad construction of

---

[2] "Because officers have many means of ensuring the safe arrest of vehicle occupants, it will be the rare case in which an officer is unable to fully effectuate an arrest so that a real possibility of access to the arrestee's vehicle remains." *Gant*, 556 U.S. at 343 n.4.
[3] "In many cases, as when a recent occupant is arrested for a traffic violation, there will be no reasonable basis to believe the vehicle contains relevant evidence." *Id.* at 343.

*Belton*—when asked why he searched the car after the defendant was already secure, the police officer responded simply "[b]ecause the law says we can do it." *Id.* at 337. But there was no independent probable cause to trigger the automobile exception, which the *Gant* Court acknowledged (with reference to *Ross*) could still be invoked if appropriate. *Id.* at 347. All the police had, however, was an anonymous tip that a certain residence, where the defendant answered the door, was being used to sell drugs. *Id.* at 335. Even the trial court in *Gant* had rejected the notion that this provided sufficient probable cause to conduct the warrantless search of the automobile but had denied the defendant's motion to suppress anyway based on the broad reading of *Belton* that essentially allowed law enforcement to conduct a search of any vehicle after arresting its driver on a traffic violation. *Id.* at 337, 343.[4] But the defendant was not, in fact, within reaching distance of the passenger compartment and he was not arrested for a drug offense (as in *Belton*); rather, he was arrested for driving with a suspended license, "an offense for which the police could not expect to find evidence in the passenger compartment of [the defendant's] car." *Id.* at 344. Accordingly, the Court "narrowed" *Belton* to the parameters within which it arguably should have been understood since the beginning and upheld the Arizona Supreme Court's conclusion that the warrantless search in *Gant* was unreasonable and that no other exception (such as the automobile exception) applied in the case. *Id.* at 341, 351.

---

[4] The *Gant* Court described how the broad construction of *Belton* had essentially been misapplying *Belton* in any event because, in *Belton*, a single officer had ordered four occupants out of a vehicle, arrested them, and patted them down when, upon stopping the car for speeding, he smelled burnt marijuana in the vehicle and observed an envelope in the vehicle that he believed contained marijuana. He only had one pair of handcuffs so he did not cuff any of the four. Thus, although they were under arrest and standing nearby, they were not secure and in theory could have still reached into the car, either for a weapon or to destroy evidence. The officer also had probable cause for the arrest based on the smell of burnt marijuana. *Gant*, 556 U.S. at 339. That is why, according to the *Gant* Court, the Court held in *Belton* that "when an officer lawfully arrests 'the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of the automobile' and any containers therein" on the grounds that "articles inside the relatively narrow compass of the passenger compartment of an automobile are in fact generally, even if not inevitably, within the area into which an arrestee might reach." *Gant*, 556 U.S. at 340-341 (quoting *Belton*, 453 U.S. at 460). In other words, the narrow reading of *Belton* applies to *Belton* itself and should control; the broad reading that came to control "may be attributable to Justice Brennan's dissent in *Belton*" but represented "a serious and recurring threat to the privacy of countless individuals." *Id.* at 341, 345.

As noted above, although a traffic stop was performed in this case "[t]o make contact with the defendant and remove him from the vehicle," which allowed Agent Vanderwarf and his colleagues to apprehend Defendant "in a safe area" (Tr. Ev. Hrg. Nov. 6, 2012, at 11-12 [Dkt. No. 23]), ample independent probable cause existed to invoke the automobile exception to the Fourth Amendment's prohibition on unreasonable searches and seizures. Agent Vanderwarf had observed a controlled buy between Defendant and the CI previously (on March 29, 2012) and, on that basis alone, had probable cause to search the vehicle Defendant was driving once he was pulled over. But in addition, Agent Vanderwarf had coordinated with the CI to set up another controlled buy and based on the reliable information provided by the CI, Agent Vanderwarf had probable cause to believe that Defendant would have three to four ounces of methamphetamine on him or with him in the vehicle as well as a safe and a guitar case with a rifle inside it. "The totality of the circumstances established a fair probability that" the car Defendant was driving "contained contraband when he drove away from" the store where he worked, as observed by Agent Vanderwarf. *Benard*, 680 F.3d at 1210. Because the information provided by the CI and obtained personally by Agent Vanderwarf would have been sufficient probable cause to obtain a warrant from a magistrate judge, *Burgess*, 576 F.3d at 1087, the warrantless search of the vehicle Defendant was driving was reasonable under the well-established automobile exception to the Fourth Amendment's requirements. *Ross*, 456 U.S. at 820-21; *Gant*, 556 U.S. at 347. Accordingly, the court denies Defendant's motion to suppress.

## **CONCLUSION**

For the reasons stated above, the court hereby DENIES Defendants' motions to suppress evidence found in the trunk of the vehicle he was driving when he was arrested on April 17, 2012. [Dkt. Nos. 18, 22, 26]

DATED this 19th day of March, 2013.

                                BY THE COURT:

                                _____
                                Clark Waddoups
                                United States District Judge